**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 210315-U

Order filed November 22, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| *In re* J.P., Jr., | ) | Appeal from the Circuit Court |
| | ) | of the 14th Judicial Circuit, |
| a Minor | ) | Rock Island County, Illinois, |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 3-21-0315 |
| | ) | Circuit No. 18-JA-79 |
| v. | ) | |
| | ) | |
| Juan P., | ) | Honorable |
| | ) | Theodore G. Kutsunis, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE WRIGHT delivered the judgment of the court.
Justices Daugherity and O'Brien concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The circuit court's decisions, first finding father unfit, and then terminating
father's parental rights, were not against the manifest weight of the evidence.

¶ 2     Respondent father, Juan P., appeals from orders of the circuit court finding father unfit

and terminating father's parental rights as to J.P., Jr. On appeal, father argues the lower court

erred in determining that father was an unfit parent and that it was in J.P., Jr.'s best interest to terminate father's parental rights.

¶ 3                                    I. BACKGROUND

¶ 4        On November 26, 2018, the State filed a petition for adjudication of wardship (neglect petition) alleging that J.P., Jr. (J.P.) (D.O.B. 11/14/2018) was a neglected minor pursuant to section 2/3 of the Juvenile Court Act of 1987 (the Act). 705 ILCS 405/2-3 *et seq*. (West 2018). The neglect petition alleged that on November 14, 2018, the Department of Children and Family Services (DCFS) received a report alleging that J.P. tested positive for amphetamines and tetrahydrocannabinol (THC) upon birth. J.P.'s mother revealed to a DCFS investigator that she had used methamphetamines during her pregnancy. The neglect petition further alleged that DCFS indicated mother for neglect in January 2017, when J.P.'s older sibling[1] tested positive for methamphetamines at birth. Lastly, the neglect petition alleged that father informed DCFS he was not able to care for J.P.

¶ 5        On February 14, 2019, father stipulated to the allegations set forth in the neglect petition. On March 7, 2019, the circuit court adjudicated J.P. neglected and found father was unable to care for J.P. due to the contents of the neglect petition. The court ordered father to cooperate with DCFS and/or Bethany for Children and Families (Agency), to successfully complete a parenting class, and to obtain and maintain appropriate housing.

¶ 6        On March 1, 2021, the State filed a supplemental petition to terminate father's parental rights (termination petition).[2] The termination petition alleged that father: (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to J.P.'s welfare (750 ILCS

---

[1]Respondent father is not the father of J.P.'s older sibling.
[2]The record does not reflect that a petition to terminate father's parental rights was filed prior to this supplemental petition.

50/1(D)(b) (West 2020)); (2) failed to make reasonable efforts to correct the conditions that were the basis for the removal of J.P. from father's care during the nine month periods of March 8, 2019, through December 8, 2019, and December 9, 2019, through September 9, 2020 (*id.* § (D)(m)(i)); and (3) failed to make reasonable progress toward the return of J.P. during the nine month periods of March 8, 2019, through December 8, 2019, and December 9, 2019, through September 9, 2020 (*id.* § (D)(m)(ii)). In support of these allegations, the State alleged father failed to comply with most of the requested drug screens, failed to maintain appropriate housing, failed to provide verification of employment, and failed to maintain consistent contact with his caseworker.

¶ 7 On June 14, 2021, the circuit court conducted a hearing on the fitness portion of the termination proceeding. Kristy Hutchinson, a case manager for the Agency, testified that she had been the caseworker in J.P.'s case for nearly two years. Hutchinson testified that father was ordered to complete a substance abuse evaluation, maintain financial stability, and maintain stable housing. Father completed a substance abuse evaluation prior to Hutchinson taking over the case and no further treatment was recommended. However, due to the Agency's concerns about father's suspected current and past substance and alcohol abuse, coupled with mother's ongoing substance abuse issues, the Agency required that father submit to monthly drug screens. Hutchinson testified that father was also suspected of being under the influence of marijuana during several visits with J.P. Father cooperated by completing approximately 50% of the requested drug screens. The results of those tests were negative for illegal substances. However, father had not cooperated by providing samples during the last six months prior to the fitness hearing.

¶ 8 Hutchinson testified that mother and father lived together until they were evicted in August or September 2020. Afterward, mother went to live with her mother. Father told Hutchinson he was staying with friends, but Hutchinson did not know where father lived. Father reported to Hutchison that he was employed as a roofer. Hutchinson explained that the Agency required father to present pay stubs monthly as verification of his employment. However, father provided Hutchinson with paystubs on three occasions in approximately two years. Hutchinson testified that father had met with her on less than five occasions, with the last occasion being in court in March 2021. Hutchinson scheduled monthly appointments with father for the purpose of reviewing the status of father's service plan/goals, but father failed to appear.

¶ 9 Regarding scheduled visitation with J.P., Hutchinson testified that visits were initially scheduled on a weekly basis. Between March 2020 and February 2021, father attended five visits. In the spring of 2020, father attended just one of the virtual visits scheduled by the Agency. After J.P.'s permanency goal changed in January 2021, visits were scheduled monthly. Father last attended a visit with J.P. in February 2021 and did not indicate why he missed so many visits.

¶ 10 In November 2020, Hutchinson received a report from mother that father was abusing alcohol, which prompted Hutchinson to request that father complete a second substance abuse evaluation. Father admitted that alcohol played a part in his relationship issues with mother, but did not comply with the request for a second evaluation. Hutchinson testified that the biggest barrier to returning J.P. to father's care was father's lack of participation. Father failed to adequately participate in services, and Hutchinson opined that father failed to make reasonable progress toward the return of J.P. at any point since the inception of the case.

¶ 11   On cross-examination, Hutchinson agreed that father was not originally ordered to complete a substance abuse evaluation, and that father completed a parenting class. Father provided Hutchinson with paystubs, which indicated that father worked for Old Town Roofers. However, Hutchinson had concerns about father's financial stability. Hutchinson cited father's eviction for failing to pay rent, and the fact that father's phone was regularly turned off, as reasons for her concerns. Hutchinson testified that because of his age, J.P. is not bonded with father. J.P. is afraid of approaching father during visits and is uncomfortable having physical contact with father.

¶ 12   Following Hutchinson's testimony, the court took judicial notice of two pending criminal cases against father: (1) case No. 21-CF-291 (charging possession of methamphetamine, aggravated driving under the influence, and driving while license revoked) and (2) case No. 21-CF-433 (possession of methamphetamine).[3]

¶ 13   At the conclusion of the hearing, the court found that the State's allegation that father had not maintained a reasonable degree of interest, concern, or responsibility as to J.P was proven by clear and conviction evidence. Thus, the court found father unfit under the Act. The court specifically noted that father failed to: attend visits regularly, obtain and maintain suitable housing, cooperate with the Agency, and cooperate with drug screens.[4]

¶ 14   A best interest was report filed on J.P.'s behalf on July 16, 2021. The report indicated that two-year-old J.P. has resided with his current foster mother since June 23, 2020. Due to his age, J.P.'s current home is the only home he has ever known. J.P.'s older sister and younger brother

---

[3]The record does not indicate from which county the charges arose. We further note that the State referenced both 2021-CF-423 and 2021-CF-433. It appears the State misspoke when reciting the pending charges.

[4]The circuit court clarified that it was not finding father unfit under either of the alleged grounds for unfitness that father failed to make reasonable efforts and/or progress during the two alleged nine month periods.

also reside in the home. J.P. is very bonded to his foster mother and her extended family. J.P. refers to his foster mother as "mommy."

¶ 15 All of J.P.'s physical, educational, emotional, and mental health needs are met by his current caregiver. J.P.'s foster mother is employed as a nurse and is able to work from home at times. J.P.'s foster mother provides financial stability and owns a three-bedroom home with a large backyard.

¶ 16 The report concluded that J.P.'s sense of security and familiarity lied with his current foster family. For these reasons, the Hutchinson recommended that father's parental rights be terminated and that J.P.'s permanency goal be changed to adoption.

¶ 17 The circuit court conducted a best interest hearing on July 22, 2021. Neither the State nor father presented evidence at the hearing. Instead, the State relied on the facts set forth in best interest report. The circuit court applied the best interest factors outlined in section 1-3(4.05) of the Act and found that the factors favored the termination of father's parental rights. 705 ILCS 405/1-3(4.05) *et seq*. (West 2020). Citing the length of the case and J.P.'s need for permanence, the court found that the termination of father's parental rights was in the best interest of J.P.

¶ 18                                   II. ANALYSIS

¶ 19 On appeal, father challenges both the circuit court's fitness and best interest findings.

¶ 20 Parental termination proceedings are initiated by the filing of a termination petition pursuant to the provisions of the Act. *Id.* § 2-13. Thereafter, a parent's rights may be terminated upon clear and convincing evidence that the parent is unfit under any of the grounds enumerated in section 1(D) of the Adoption Act. *In re D.D.*, 196 Ill. 2d 405, 417 (2001); 750 ILCS 50/1(D) *et seq*. (West 2020). A circuit court's fitness determination will not be reversed on appeal unless the ruling is against the manifest weight of the evidence. *In re D.D.*, 196 Ill. 2d at 417.  A ruling

6

is against the manifest weight of the evidence where the opposite conclusion is clearly evident. *Id.*

¶ 21    In this case, the circuit court found that father failed to maintain a reasonable degree of interest, concern, or responsibility as to J.P.'s welfare pursuant to section 1(D)(b) of the Adoption Act. 750 ILCS 50/1(D)(b) (West 2020). The caselaw provides that any of these three elements — interest, concern, or responsibility — may be considered independently as a basis for unfitness. *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004); *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31. "In determining whether a parent has shown a reasonable degree of interest, concern or responsibility for a child's welfare, courts consider a parent's efforts to visit and maintain contact with the child, as well as other indicia of interest, such as inquiries into the child's welfare." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). Courts consider a parent's conduct in the context of the circumstances in which the conduct occurs, including, for example, difficulty obtaining transportation, poverty, the conduct of others that hinders visitation, and the motivation underlying a parents failure to visit. *Id.* While completion of services is indicative of a parent's level of concern, interest, and responsibility, courts will consider a parent's efforts, regardless of whether those efforts were successful. *Id.* at 1065.

¶ 22    On appeal, father admits that his failure to appear for drug screens and scheduled visitation, along with his failure to deliver verification of his employment on more than three occasions, "lend credence to the notion that he did not maintain interest, concern, or responsibility." However, father argues his conduct must be viewed in the context of his unique circumstances. Father asserts that following a completed substance abuse evaluation that did not recommend additional treatment, it was unreasonable for the agency to require father to submit to drug screens.

¶ 23    Here, J.P. came into protective care after the child tested positive for the presence of amphetamines and THC at birth. During several visits, the Agency suspected that father was under the influence of marijuana. Accordingly, the Agency's concerns over father's potential for a relapse resulting in the use of marijuana and/or other substances were reasonable measures to protect J.P.'s wellbeing.

¶ 24    Next, father further asserts the Covid-19 pandemic made it difficult to attend weekly visits with J.P. from March 2020 and January 2021. During that timeframe, father attended approximately five visits without making any contemporaneous assertion of difficulties due to Covid-19. In fact, Hutchinson testified that father failed to take advantage of the virtual visits that were scheduled by the Agency in the spring of 2020. Moreover, father had not participated in any type of scheduled visitation during the last four months before the fitness hearing.

¶ 25    Finally, father points out that he maintained employment throughout the pending proceedings, a factor to be considered in his favor. Yet, the State's uncontradicted evidence established that failed to keep in contact with his Hutchinson, failed to obtain and maintain appropriate housing, and failed to father provide Hutchinson with verification of his employment as required. Therefore, defendant's assertions regarding his employment status could not be verified by his Hutchinson's testimony.

¶ 26    For these reasons, we cannot say the court's finding that father failed to maintain a reasonable degree of interest, concern or responsibility as to J.P.'s welfare was against the manifest weight of the evidence.

¶ 27                                B. Best Interest

¶ 28    Following a finding of parental unfitness, the court's focus must shift to the child's interest in "a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). At this stage, the

State's burden of proof lessens to a preponderance of the evidence. *Id.* at 366-67. When considering whether the termination of parental rights serves the child's best interest, court's consider: (a) the physical safety and welfare of the child, including food, shelter, health, and clothing; (b) the development of the child's identity; (c) the child's background and ties, including familial, cultural, and religious; (d) the child's sense of attachment; (e) the child's wishes and long-term goals; (f) the child's community ties; (g) the child's need for permanence; (h) the uniqueness of every family and child; (i) the risks attendant to entering and being in substitute care; and (j) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) *et seq.* (West 2020). A circuit court's determination as to the best interest of a child will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence. *In re Parentage of J.W.*, 2013 IL 114817, ¶ 55.

¶ 29     The record before this court establishes that J.P. does not have a strong bond with his father. It is undisputed that J.P. displays anxiety and fear prior to, and during, the visits with father, and exhibits negative behaviors following those visits. In contrast, J.P. has resided with his current foster mother since June 2020. J.P. is bonded to his foster mother and to her extended family. J.P. lives with his two siblings, where his physical, educational, emotional, and mental health needs are met. J.P.'s sense of security and familiarity lie with his current foster family.

¶ 30     Based on the evidence, the statutory factors enumerated in section 1-3(4.05) *et seq.* supported the termination of father's parental rights. We affirm the termination of father's parental rights.

¶ 31                                    III. CONCLUSION

¶ 32     The judgment of the circuit court of Rock Island County is affirmed.

¶ 33     Affirmed.

9